2003 VT 107

## Paul Crosby v. City of Burlington

[844 A.2d 722]

No. 01-271

Present: **Amestoy, C.J., Johnson and Skoglund, JJ., and Allen, C.J. (Ret.) and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed November 21, 2003[1]

Motion for Reargument Denied February 11, 2004

---

[1] This appeal was originally argued in March 2002, and then resubmitted on briefs in August 2003 following the retirement of Justice Morse and the recusal of Justice Dooley from the case.

*Beth Robinson* of *Langrock Sperry & Wool, LLP*, Middlebury, for Plaintiff-Appellee.

*John T. Leddy* and *Kevin J. Coyle* of *McNeil, Leddy & Sheahan*, Burlington, for Defendant-Appellant.

*Susan P. Ritter*, Montpelier, for Amicus Curiae Vermont League of Cities and Towns.

*Joseph C. Galanes* of *Biggam, Fox & Skinner*, Montpelier, for Amicus Curiae Vermont Association for Mental Health.

*James J. Dunn* of *Mickenberg, Dunn, Kochman, Lachs & Smith, PLC*, Burlington, and *Kurt Rumsfeld*, Washington, DC, for Amicus Curiae Professional Firefighters of Vermont and International Association of Fire Fighters.

¶ 1. **Amestoy, C.J.** In this workers' compensation action, defendant City of Burlington appeals from a judgment based on a jury verdict, finding that plaintiff Paul Crosby suffered a compensable psychological injury arising out of his employment as a firefighter with the City. The City raises two principal claims on appeal: (1) that Chapter II, § 70 of the Vermont Constitution precludes workers' compensation benefits for psychological injuries unconnected to physical trauma; and (2) that the trial court's jury instruction on the standard for determining whether such injuries resulted from unusual workplace stress requires reversal

because it was inconsistent with the standard adopted by the Commissioner of the Department of Labor and Industry and the purpose of the workers' compensation law. We agree with the second contention, and therefore reverse and remand for further proceedings consistent with the views expressed herein.

¶ 2. Plaintiff began working for the City as a firefighter in 1975 and was promoted to the position of lieutenant in 1989. In the summer of 1994, he stopped working and sought workers' compensation benefits because he was experiencing stress at a level greater than he could handle. Plaintiff identified the stress causing his injury as anxiety resulting from the collapse of a building during a May 1994 three-alarm fire and his transfer in June 1994 from a shift he had been working since 1989. He alleged that his reaction to the foregoing incidents triggered repressed memories of a gruesome 1991 car fire and caused him to lose confidence in his superiors and his ability to do his job safely.

¶ 3. Between the summer of 1994 and the spring of 1995, plaintiff saw a number of physicians, including two psychiatrists, and a succession of therapists who generally agreed that plaintiff was not fit to return to duty. Several diagnosed his injury as post-traumatic-stress disorder. The City formally terminated plaintiff in March 1995, and later denied his claim for workers' compensation benefits. The matter was brought before the Commissioner of the Department of Labor and Industry, who found in favor of the City, ruling that plaintiff was not entitled to benefits because he had failed to demonstrate that the stressful stimuli causing his injury were objectively real and unusual.

¶ 4. In so ruling, the Commissioner noted that the diagnoses provided by plaintiff's medical experts, in contrast to that of the City's expert, were based on plaintiff's own subjective beliefs concerning the danger posed by the May 1994 fire, beliefs that were contradicted by other witnesses. In the Commissioner's view, irrespective of whether plaintiff's injury was brought on by a sudden stimulus or cumulative stress, plaintiff was required to demonstrate an objectively sound basis for his injury. The Commissioner concluded that he had failed to do so. The Commissioner also concluded that the appropriate control group to consider in determining whether plaintiff had been subjected to unusual stress was firefighters in general rather than all workplace employees. The Commissioner determined that plaintiff was not entitled to workers' compensation benefits because the evidence demonstrated that the stress he was experiencing stemmed from normal workplace pressures related to fighting fires, being transferred, and engaging in conflicts with his superiors.

¶ 5. Plaintiff appealed the decision and sought a de novo jury trial in the superior court. See 21 V.S.A. § 670. Following a two-day trial, the court instructed the jury to determine: (1) whether plaintiff had suffered a psychological injury; (2) if so, whether the injury was caused by factors arising from his employment; and (3) if so, whether the injury resulted from stress that was significantly greater than that experienced by the general population of employees. The jury answered each of the three questions in the affirmative, and the trial court granted judgment in favor of plaintiff. This appeal followed.

## I.

¶ 6. The City first contends that the Vermont Constitution bars plaintiff's recovery because it prohibits workers' compensation benefits for psychological injuries unconnected with physical trauma. We disagree.

¶ 7. In relevant part, Chapter II, § 70 of the Vermont Constitution provides that the "General Assembly may pass laws compelling compensation for injuries received by employees in the course of their employment resulting in death or bodily hurt." The City argues that the plain meaning of the phrase "bodily hurt," particularly when considered in its historical context, is that the Legislature may authorize workers' compensation benefits only for injuries having a physical component. In support of this position, the City notes that at the time § 70 was added to the Vermont Constitution in 1913, the Vermont House of Representatives reported that workers' compensation would be allowed only for "violence to the physical structure of the body," Journal of the House of the State of Vermont, Biennial Session, at 1034 (February 20, 1913), and compensation for mental injuries unconnected to physical trauma was virtually unknown in Vermont negligence law. See Nichols v. Central Vt. Ry., 94 Vt. 14, 18, 109 A. 905, 907 (1919) (citing contemporary authority for the doctrine that, in absence of statute, no recovery for mental suffering without attendant physical injury is available in ordinary actions for negligence).

¶ 8. We find the constitutional argument unpersuasive. The phrase on which the City relies — "violence to the physical structure of the body" — is taken from an amendment to a House bill that failed to pass the Senate. See Journal of the House of the State of Vermont, Biennial Session, at 1033-34 (Feb. 20, 1913); Journal of the Senate of the State of Vermont, Biennial Session, at 972-73 (Feb. 21, 1913). Even if we assumed that the language in question barred awards for psychological injuries, but cf. Bailey v. Am. Gen. Ins. Co., 279 S.W.2d 315, 318-19 (Tex. 1955) (court construed phrase "physical structure of the body" to include any harm to

person), the provisions of a defeated statute can hardly be relied upon to support the interpretation of a completely separate constitutional amendment.

 ¶ 9. As for the actual text of § 70, "bodily hurt," we agree with the City that we must consider the language in historical context, but we arrive at a different conclusion from that urged by the City. Section 70 was added to the Vermont Constitution in response to concerns that the employer liability bills being considered at the time were susceptible to constitutional attack. W. Flint, *The Progressive Movement in Vermont*, "Labor Obtains a Workmen's Compensation Act," at 86-87 (Am. Council on Public Affairs, Washington, D.C., 1941). These concerns were fueled by a 1911 decision of the New York Court of Appeals striking down New York's fledgling workers' compensation law. *Id.*; see *Ives v. South Buffalo Ry.*, 94 N.E. 431 (N.Y. 1911). It is thus clear that the purpose of § 70 was to insulate pending workers' compensation laws from constitutional attack, not to prevent workers from obtaining benefits based on psychological injuries.

¶ 10. The City does not argue that the Legislature intended the term "personal injury" in 21 V.S.A. § 618 to require physical injury or to exclude psychological injury unconnected to physical trauma. Rather, the City would have us hold that such claims are prohibited based on a 1913 constitutional amendment that was added to the Vermont Constitution to assure the survival of the workers' compensation statute, not to restrict its reach. Absent any more persuasive evidence, we decline to so hold.

## II.

 ¶ 11. The City next contends the trial court erred by instructing the jurors that they should consider the "general population of employees" in determining whether plaintiff was subjected to unusual work-related stress. To understand the claim, a brief review of the legal background is instructive. Our workers' compensation statute requires employers to compensate "a worker [who] receives a personal injury by accident arising out of and in the course of employment." 21 V.S.A. § 618(a)(1). In analyzing whether an injury qualifies under workers' compensation law as an accidental personal injury arising out of and in the course of employment, courts and commentators have divided claims into four general categories: (1) physical injury caused by physical stimulus; (2) physical injury caused by mental stimulus; (3) nervous injury caused by physical stimulus; and (4) nervous injury caused by mental stimulus. See 3 A. Larson, Larson's Workers' Compensation Law § 56.01, at 3 (2000).

This case indisputably falls within the latter group, often described as "mental-mental" claims.

¶ 12. At least twenty-nine states provide workers' compensation coverage for mental-mental claims, and fifteen do not. *Id.* § 56.06[3]-[4], at 52. Of the states that accept mental-mental claims, some require no more of a showing than that required of claims for physical injuries, others require a showing that the psychological injury resulted from a sudden stimulus, and still others require a showing that the stress was unusual when compared with one or another control group. *Id.* § 56.06[2]-[7], at 51-53. Some state legislatures, in the face of court decisions establishing liberal standards for mental-mental claims, have amended their workers' compensation laws to limit such claims through a variety of means, such as requiring a set amount or type of stress, raising the standard of causation, increasing the burden of proof, imposing specific diagnostic guidelines, limiting the amount of benefits, or even excluding benefits altogether. *Id.* § 56.06[1][a]-[b], at 47-51.

¶ 13. The only case in which this Court has dealt with a mental-mental claim is *Bedini v. Frost*, 165 Vt. 167, 678 A.2d 893 (1996). There the claimant was a medical receptionist who had worked at her job for less than a year before leaving because of job-related stress. The Commissioner denied her claim for workers' compensation benefits, finding that she had not been subjected to unusual working conditions, and we affirmed that decision. In so holding, we acknowledged that § 618 does not expressly differentiate between physical and mental injuries, but nonetheless deferred to the Commissioner's decision to adopt an unusual-stress standard for mental-mental claims based on "reasonable policy concerns." 165 Vt. at 169, 678 A.2d at 894. These included the Commissioner's finding that medical authorities often disagree on "the precise etiology of most mental disorders," that many sources outside of the employment setting — including culture, heredity, social environment, and family relationships — may cause or contribute to psychological injuries, and that medical opinions relating to the cause of such injuries are often based on the claimant's subjective viewpoint. *Id.* An unusual-stress standard permits "a more objective inquiry" into the cause of the mental injury, *id.*, protects against fraudulent claims, and "prevents the conversion of workers' compensation into general health insurance." *Id.* at 170, 678 A.2d at 894.

¶ 14. Although the Commissioner in *Bedini* had expressed the unusual-stress standard in terms requiring that the applicant experience "a significantly greater dimension [of stress] than the daily stresses encountered by all employees," *id.* at 169, 678 A.2d at 894, she did not delineate

with care the control group of "all employees" whose daily stresses were to be compared with the applicant's, nor did we address the issue. As Justice Johnson explained in her dissent, however, unusual workplace stress has been measured in at least three different ways. *Id.* at 173, 678 A.2d at 896 (Johnson, J., dissenting). One approach requires claimants to show that they were subjected to unusual pressures compared to other employees in the same workplace with similar responsibilities; another approach measures the pressures experienced by a claimant against those encountered by all employees doing the same job, sometimes referred to as the Wyoming approach; and a third approach requires a showing that a claimant experience pressures of a significantly greater dimension than those generally encountered by all employees in a working environment, often referred to as the Wisconsin approach. *Id.*; see 2 A. Larson, *supra*, § 44.05[4][d], at 52-56 (in determining whether claimant was subjected to unusual stress, courts may compare stress encountered by claimant with similar employees' normal strains, strains of employment life in general, or strains of everyday nonemployment life).[2]

¶ 15. The second approach — measuring the claimant's stress against that of all other workers performing the same job — is the standard advocated by the Commissioner in this case, and, while the Department's decisions have not been a model of consistency, it is the approach the

---

[2] Although plaintiff here claims that *Bedini* adopted the "all-employees-in-the-workforce" standard, our opinion was concerned solely with whether the workers' compensation statute supported the Commissioner's decision to "differentiate between physical and mental injuries" by adopting an unusual-stress standard. 165 Vt. at 170, 678 A.2d at 894. To assert that *Bedini* resolved the complex control-group issue without comment or discussion strains credulity. If anything, however, the Commissioner's broad reference in *Bedini* to "all employees" masked a decision to utilize a much narrower control group composed of similarly situated employees of the same employer. See *Graves v. Utah Power & Light Co.*, 713 P.2d 187, 192 (Wyo. 1986) (the "'all employees' standard could be based upon three different groups," a worker's "fellow employees" doing the same or similar job, workers generally in the same job, or the "working world at large"). As Justice Johnson observed in her dissent, while the Commissioner had "articulated" a standard based on "all employees," the approach that came "closest to what the Commissioner ha[d] actually done" utilized a control group of "other employees in the same workplace with similar responsibilities." *Bedini*, 165 Vt. at 173, 678 A.2d at 896 (Johnson, J., dissenting). Thus, by adopting the Commissioner's approach, it is at least arguable that *Bedini* endorsed the most narrow control group of the three. This is the conclusion, in fact, of the preeminent workers' compensation authority, who has categorized *Bedini* as a case requiring the claimant to "show that his or her stresses at work were significantly greater than the stress levels affecting co-employees." 3 A. Larson, Larson's Workers' Compensation Law § 56.06D[6], at 143 (2000). It is clear to us, however, that *Bedini* did not actually address or decide the control-group issue.

Commissioner has generally applied to determine whether an applicant's work-related pressures meet the unusual-stress standard. For example, in *Cross v. Vermont Dep't of Pub. Safety*, Op. No. 27-94WC, at 6 (Aug. 1, 1994), decided prior to *Bedini*, the Commissioner rejected the applicant's claim for benefits resulting from stress-related mental injuries, noting that the applicant had "failed to establish that in relation to other similarly situated employees the burdens upon her were greater than they were upon them." In *Bedini*, as noted, the Commissioner's denial of benefits was based in part on a factual finding that other workers in the claimant's office were subjected to similar stresses.

¶ 16. The Commissioner's decisions since *Bedini* have not always clarified whether the control group of similarly situated employees includes all workers in similar jobs regardless of employer, or all workers employed in similar jobs by the same employer, but none appears to have applied a "working world at large" standard. In *Estate of Fatovich v. Burlington Free Press*, Op. No. 19-97WC, at 8 (July 29, 1997), for example, the Commissioner rejected the applicant's claim for injuries from work-related stress, observing that the employee's psychological distress was not caused by "stressful work events which were greater than the stress experienced by similarly situated employees." Similarly, in *Bell v. EHV Weidman*, Op. No. 03-01WC, at 11 (Feb. 5, 2001), the Commissioner — citing *Bedini* — observed that an applicant claiming mental injury from workplace stress must demonstrate "that the stress is of significantly greater dimension than the daily stresses encountered by similarly situated employees." Again, in *DuBuque v. Grand Union Co.*, Op. No. 34-02WC, at 11 (Aug. 20, 2002), the Commissioner found that a claimant seeking benefits for mental injury resulting from work-related stress had failed to prove that "the stress is of significantly greater dimension than the daily stresses encountered by similarly situated employees." And in a case involving a firefighter claiming mental injury from a stressful work environment, the Commissioner specifically found that the claimant had not demonstrated work-related stresses "that were of a significantly greater dimension than the daily stresses encountered by other firefighters." *Gallipo v. City of Rutland*, Op. No. 22-00WC, at 7 (July 12, 2000).

¶ 17. Thus, in this — as in most recent decisions — the Commissioner has applied the unusual-stress standard to require a comparison of claimant's stress to that of other similarly situated employees performing the same or similar work. The Commissioner's approach is hardly unique. Although new to this Court, the question of the proper control group to be used for purposes of assessing whether an applicant's work-related

stress is unusual has been extensively explored by other courts and commentators. Justice Johnson cogently summarized the three basic approaches in her *Bedini* dissent; one requires a showing that the claimant suffered greater than normal stress as compared to all workers in general; a second compares the claimant's stress to other workers in the same workplace with similar responsibilities; and a third measures the claimant's stress as against other similarly situated employees, regardless of employer. *Bedini*, 165 Vt. at 173, 678 A.2d at 896-97 (Johnson, J., dissenting); see generally 2 A. Larson, *supra*, § 44.05[4][d], at 52-53; *Graves v. Utah Power & Light Co.*, 713 P.2d 187, 192 (Wyo. 1986) (discussing basic approaches for applying unusual-stress standard).[3]

¶ 18. Although a few courts have adopted the so-called Wisconsin standard that compares a claimant's stress to the daily strains which all employees must experience, see, e.g., *Townsend v. Me. Bureau of Pub. Safety*, 404 A.2d 1014, 1019 (Me. 1979); *School Dist. # 1, Vill. of Brown Deer v. Dep't of Indus., Labor & Human Relations*, 215 N.W.2d 373, 377-78 (Wis. 1974), others have specifically rejected it in favor of the Wyoming standard that looks to the "day-to-day mental stresses experienced by other workers employed in the same or similar jobs." *Graves*, 713 P.2d at 193; accord *Dunlavey v. Econ. Fire & Cas. Co.*, 526 N.W.2d 845, 858 (Iowa 1995) (employee must establish that mental injury was caused by workplace stress of greater magnitude "than the day-to-day mental stresses experienced by other workers employed in the same or similar jobs"); *Williams v. DePaul Health Ctr.*, 996 S.W.2d 619, 628 (Mo. Ct. App. 1999) ("[w]e are persuaded that the proper comparison . . . is to compare Employee's work-related stress with the stress encountered by employees having similar positions, regardless of employer"); see also *McClain v. Texaco, Inc.*, 780 S.W.2d 34, 37 (Ark. Ct. App. 1989) (holding that "ultimate test is whether the stress constitutes an abnormal working condition for that type of employment," rather than claimant's co-workers); *Southwire Co. v. George*, 470 S.E.2d 865, 870-71 (Ga. 1996) (Sears, J., specially concurring) (plurality in dictum urges adoption of Wyoming over Wisconsin standard for reasons set forth in *Dunlavey*, 526 N.W.2d at 857-58); *Davis v. Workmen's Comp. Appeal Bd.*, 751 A.2d 168, 177 (Pa. 2000) (for work conditions to be considered abnormal, "'they must be considered in the context of the specific employment'") (quoting *Wilson v. Workmen's Comp. Appeal Bd.*, 669 A.2d 338, 343 (Pa. 1996)).

---

[3] Still another approach is to compare the claimant's stress with the strains of everyday non-employment life in general. See 2 A. Larson, *supra*, § 44.05[4][d], at 53.

¶ 19. Sound policy reasons support such an approach. As noted, *Bedini* itself was based on a recognition that purely psychological injuries may result from so many "diverse factors" that "a high degree of uncertainty exists in the diagnosis of cause." 165 Vt. at 169, 678 A.2d at 894. It is precisely this uncertainty of origin that has persuaded many courts and commentators to conclude that the optimum control group for determining unusual stress is that of other similarly situated employees in the same or similar jobs. In contrast to the broad "all employees" standard, which the court in *Graves* aptly noted is "too amorphous to be practical," 713 P.2d at 193, or the narrow class of workers with the same employer, which may be too limiting where the business has few employees, see *Dunlavey*, 526 N.W.2d at 857, a control group comprised of similarly situated workers in the same general field provides a relatively precise, fair, and empirically workable standard.

¶ 20. A control group comprised of the "working world" would offer little in the way of assuring the validity of claims. It is difficult to imagine that a claimant or employer under an "all employees" rubric would not be able to produce some witness from the workplace whose "work-related stress is either significantly less or significantly greater than the stress experienced by the claimant." N. Riley, *Mental-Mental Claims — Placing Limitations on Recovery Under Workers' Compensation for Day-to-Day Frustration*, 65 Mo. L. Rev. 1023, 1043 (2000). Such a moveable standard could defeat the very purpose of the unusual-stress requirement, which is to ensure compensation for deserving claimants while simultaneously protecting against "fraudulent claims and prevent[ing] the conversion of workers' compensation into general health insurance." *Bedini*, 165 Vt. at 170, 678 A.2d at 894. As the court in *Dunlavey* explained: "By comparing the stresses endured by similarly situated employees, the Wyoming standard provides the employees with compensation for legitimate work related injuries while at the same time limits the employers' liability to injuries caused by its industry." 526 N.W.2d at 857.

¶ 21. The similarly-situated standard also offers the practical advantage of allowing both parties to focus on producing evidence of actual employment conditions in a specific field, "rather than trying to take into account the level of stress placed on the work force as a whole." Riley, *supra*, 65 Mo. L. Rev. at 1043. This has the added benefit of promoting consistency among similar cases; an all-employees test, in contrast, could result in dissimilar outcomes depending upon the stress levels in the at-large employment context on which the parties choose to focus. See G. Dawes, *Eligibility for Workers' Compensation in Cases of Nontraumatic*

*Mental Injury: The Development of the Unusual Stress Test in Wisconsin*, 1987 Wis. L. Rev. 363, 372 (different results could occur where "each court focuses on the stresses present in a different context of daily life").

¶ 22. These various advantages have led commentators to conclude that the similarly-situated standard provides a "realistic and balanced test of legal causation," M. Duckworth & T. Eick, *Recent Developments in Mental/Mental Cases Under the Iowa Workers' Compensation Law*, 45 Drake L. Rev. 809, 837 (1997), that is "superior to the other comparison standards." Riley, *supra*, 65 Mo. L. Rev. at 1043. The result, to be sure, may be that some employees in high-stress jobs will fail to establish claims where other workers, confronted with similar strains, might succeed. By its nature, however, the unusual-stress test "is necessarily underinclusive." Dawes, *supra*, 1987 Wis. L. Rev. at 373. *Bedini* established that not every employee who suffers mental injury from workplace stress will recover; to establish the requisite causal nexus between psychological injury and workplace stress a claimant must meet a heightened standard of proof premised upon a showing of unusual stress. 165 Vt. at 169-70, 678 A.2d at 894. By focusing on the conditions and pressures endemic in the claimant's specific field of employment, the Commissioner does not undermine the purpose of the workers' compensation law — as plaintiff asserts — but rather serves that purpose by ensuring that only genuine claims for workplace stress are compensated.

¶ 23. Although the similarly-situated standard thus enjoys the support of the Commissioner, commentators in the field, and other states, plaintiff asserts that it is predicated on the discredited doctrine of "assumption of the risk." Plaintiff is mistaken. It is fair to measure a claimant's stress by the conditions normal to his or her field or profession not because the claimant implicitly "assumes" the risks of employment, but rather because it is reasonable to assume that the claimant is prepared to deal with the normal strains of his or her occupation through training, temperament, and experience. Thus, the standard does not prejudice workers in high-stress fields, or benefit workers in low-stress occupations, but "allows for a uniform application of a legal standard across the wide spectrum of all jobs." Duckworth & Eick, *supra*, 45 Drake L. Rev. at 837.

¶ 24. While other approaches are certainly possible, the Commissioner's reliance on a control group comprised of "similarly situated" employees is well supported by established authority and sound policy. Therefore, under our traditionally deferential standard of review the Commissioner's approach is entitled to control. See *In re Duncan*, 155 Vt. 402, 408, 584 A.2d 1140, 1144 (1990) (absent compelling indication of

error, interpretation of statute by administrative body responsible for its execution will be sustained on appeal). We hold, therefore, that the trial court erred in instructing the jury to determine whether plaintiff's stress was unusual as compared with the general population of employees, rather than with all other employees performing similar work. Accordingly, the judgment must be reversed.

¶ 25. The parties raise several additional claims that require little discussion. The City urges an unusual-stress rule that would bar any claim for injuries sustained in the performance of duties within the claimant's job description. The City cites no persuasive authority for such a rule, which we reject as inflexible and unnecessary to serve the purposes of the unusual-stress standard. The City also contends the "working world" standard contained in the trial court instruction violates the Common Benefits Clause, Vt. Const., ch. I, art. 7, by treating dissimilar employees the same. Our holding renders this argument moot. Finally, plaintiff asserts on cross-appeal that regardless of the applicable control group, there was no need to give an unusual-stress instruction because his injuries were the result of a "sudden stimulus." See 3 Larson, *supra*, § 56.04[2]-[7] (discussing distinction some courts have drawn between injuries caused by sudden stimulus and those caused by cumulative stress). We need not address the question, however, as the record shows that plaintiff's psychological injury claim had several sources, including personnel problems unrelated to the 1991 and 1994 fires, and we therefore find no error in the instruction.

*The judgment is reversed, and the matter is remanded for further proceedings consistent with the views expressed herein.*

¶ 26. **Johnson, J.,** dissenting. The majority opinion not only lacks support in the workers' compensation statute, but it interprets that statute in a way that disadvantages workers who perform society's most dangerous and often most critical jobs. The claimant in this case was employed as a firefighter. After nineteen years on the job, he terminated his employment and filed a compensation claim because he was experiencing an intolerable level of stress and anxiety related to his work. The Commissioner of Labor and Industry acknowledged that claimant's injury was caused by workplace pressures, but nonetheless denied the claim on the ground that the pressures were typical of those encountered by all firefighters. In other words, claimant should have been able to tolerate any stress suffered from the day-to-day work of fighting fires. Following a de novo trial in the superior court, the jury concluded in special interrogatories that claimant's stress was work-related and that

claimant was entitled to workers' compensation benefits because his psychological injury resulted from stress significantly greater than that typically encountered in the general workplace. On appeal to this Court, the majority acknowledges, as it is bound to do, that claimant's injury is work-related. Nevertheless, the majority refuses to uphold the jury's award because the trial court did not instruct the jury that, to prove causation, a firefighter must demonstrate that the claimed injury resulted from extraordinarily stressful events compared to those typically encountered by other firefighters. In so holding, the majority decision sets forth an entirely new policy direction that is inconsistent with our statute mandating that workers be compensated for work-related injuries. Accordingly, I respectfully dissent.

¶ 27. The governing statute, 21 V.S.A. § 618(a)(1), provides for compensation to any worker who "receives a personal injury by accident arising out of and in the course of employment." The majority acknowledges that the term "personal injury" includes a mental disorder or disability arising from workplace experiences, whether or not caused by physical trauma. The statute requires only that the injury be work-related; it does not require *any* additional proof of causation for mental stress claims. The test that the majority adopts to reverse the jury verdict is employed by the Commissioner to ferret out fraudulent claims and to assure that workers claiming mental injuries have been injured as the result of stress caused by work — a fact that is not in doubt in this case. Thus, the test, which is merely a tool to aid the Commissioner in determining a difficult factual question, is being used to deny the claim in a case where we know the injury is work-related. The tail is wagging the dog.

¶ 28. Nor do I find persuasive the majority's position that it is fair to adopt a higher standard of causation, one that makes it more difficult for emergency personnel to establish stress-related claims, because persons in stressful occupations should be able to cope with the greater strains of their occupation through training, temperament, and experience. Like all of us, those working as police officers, firefighters and other emergency personnel are human beings susceptible to stress, and, invariably, some of them will suffer work-related injuries because of that stress. When they do, our law entitles them to compensation. It may well be that emergency personnel will submit more stress-related claims than office workers. So be it. It is beyond our role, or that of the Commissioner, to rewrite the law in an attempt to limit the number of claims filed or to prevent the workers' compensation system from becoming a "general health insurance program," as the majority fears.

¶ 29. Notwithstanding the majority's contentions to the contrary, today's decision is not compelled by our prior case law or by any deferential standard of review that we have applied to the Commissioner's decisions in the past. Until today, the only time that this Court has addressed a mental stress claim is in *Bedini v. Frost*, 165 Vt. 167, 678 A.2d 893 (1996), where we upheld the Commissioner's denial of a medical receptionist's stress-related claim. The sole issue on appeal in that case was whether we should defer to the Commissioner's standard requiring those making so-called mental-mental claims to " 'show that the stresses at work were of a significantly greater dimension than the daily stresses encountered by all employees.' " *Id.* at 169, 678 A.2d at 894 (quoting Commissioner). We deferred to the Commissioner's heightened standard for mental-mental claims — even though the statute does not distinguish between mental and physical injuries — because there was a reasonable basis for concluding that the standard furthered the purpose of Vermont law to compensate workers only for work-related personal injuries. We acknowledged "that the precise etiology of most mental disorders is inexplicable," and that because of the diverse factors that may cause mental illness, diagnosing cause is a highly uncertain task. *Id.* We emphasized that requiring mental-mental claimants to show that they were subjected to unusually stressful working conditions would create more objectivity in determining causation, particularly "because the claimant's subjective impression that work-related stress caused [the] injury often forms the basis for the medical opinion that the injury was caused primarily by work-related stress." *Id.* at 169-70, 678 A.2d at 894.

¶ 30. In short, in *Bedini*, we concluded that the policy objectives underlying our workers' compensation law — to restrict benefits to work-related injuries — supported the Commissioner's decision to require mental-mental claimants to show that they had been subjected to unusually stressful working conditions "of a significantly greater dimension than the daily stresses encountered by all employees." *Id.* In this case, the superior court instructed the jury using *precisely* the same language that we accepted in *Bedini*. Nevertheless, the majority now concludes that we never addressed what the control group should be under the unusual-stress standard, and that, to the extent that the Commissioner and this Court in *Bedini* articulated an "all employees" control group, a different control group — "all similarly situated employees" — was really intended. In support of these contentions, the majority cites other decisions by the Commissioner invoking the "similarly situated employees" standard, as well as my dissent in *Bedini*.

¶ 31. Neither the Commissioner's prior or subsequent decisions nor my dissent in *Bedini* support the majority's position. To apply the unusual-stress standard, there must be some control group — the standard cannot exist in a vacuum. In determining whether unusual stressors existed at work, the question must be answered — unusual in what context? As I repeatedly emphasized in my dissent in *Bedini*, the Commissioner in that case had "articulated," "adopted," and "chosen" the broad Wisconsin "all employees" standard, but had actually considered criteria inconsistent with that standard. See *id.* at 172-74, 678 A.2d at 896-97 (Johnson, J., dissenting). The main thrust of the dissent, however, was my concern that the Commissioner had exceeded her statutory authority by employing any kind of heightened standard for mental-mental claims, given that our workers' compensation law did not distinguish between physical and mental injuries. See *id.* at 175, 678 A.2d at 897 (Johnson, J., dissenting). In any event, my dissent in *Bedini* certainly made the Court aware of the various control groups — including the "similarly situated employees" control group adopted today — that had been followed by other jurisdictions. See *id.* at 173, 678 A.2d at 896 (Johnson, J., dissenting) (delineating different approaches).[4] Nevertheless, the majority in *Bedini* simply adopted the "all employees" standard articulated by the Commissioner in that case.

¶ 32. Further, although the Commissioner in *Bedini* considered criteria inconsistent with the "all employees" control group she articulated, there is little doubt that she intended to apply that control group. The Commissioner cited three prior decisions in support of her application of the "all employees" control group. The earliest was a 1985 case in which the Commissioner first determined that mental-mental injuries were covered under Vermont's workers' compensation act. See *Hannon v. Woodstock Inn*, Op. No. 19-85WC, at 7 (Apr. 22, 1986). In that case, the Commissioner concluded that there was no logical basis for distinguishing between physical and emotional disability, and that the governing statute did not make any such distinction. *Id.* The Commissioner determined that the standard for accepting mental-mental claims should *not* be any more restrictive than for claims based on physical injuries, but that awards for mental-mental injuries could not be based solely on the claimant's subjective perceptions. *Id.* at 7-8. In the second decision, however, the

---

[4] In discussing the various control groups adopted in other jurisdictions, I noted some of the problems inherent to each group, including the "all employees" group. See *Bedini*, 165 Vt. at 173, 678 A.2d at 896-97 (Johnson, J., dissenting). Nevertheless, my view was, and still is, that the Legislature, not the Commissioner or this Court, should weigh the complex policy considerations involved in determining whether and, if so, how to limit mental stress claims.

Commissioner required those seeking compensation for nontraumatic mental-mental work-related injuries to show that the injury resulted "from an employment situation of clearly greater dimension than the day-to-day emotional strain and tension experienced *by an ordinary employee* or there must be no other possible causes for the claimant's mental injury, except for the tensions of the workplace." *Wilson v. Quechee Lakes Landowners Ass'n*, Op. No. 9-87WC, at 6 (Nov. 4, 1987) (emphasis added). In the third decision, the Commissioner applied the same "all employees" standard articulated in *Wilson*. See *Mazut v. Gen. Elec. Co.*, Op. No. 3-89WC, at 8 (Oct. 26, 1990).

¶ 33. For the most part, the majority cites more recent decisions by the Commissioner to support its conclusion that, in *Bedini*, the Commissioner was not really adopting the standard that she stated she was adopting. It may be that the Commissioner's decisions have evolved to apply a "similarly situated employee" control group, but that does not change the fact that (1) the Commissioner in *Bedini* articulated the "all employees" control group; (2) this Court adopted that standard; and (3) the trial court in this case properly instructed the jury on that standard.

¶ 34. Nevertheless, because the majority prefers the Commissioner's current policy approach, it now concludes that this Court must defer to the Commissioner's ever-evolving and more exclusive control group. I strongly disagree. We owe the Commissioner no deference in such circumstances. See *Martin v. State*, 2003 VT 14, ¶¶ 8, 15, 175 Vt. 80, 819 A.2d 742 (administrative bodies have only adjudicatory authority conferred upon them by statute; administratively adopted regulations that compromise intent of authorizing statute will not be upheld).

¶ 35. I reiterate that, in *Bedini*, we deferred to the Commissioner's judgment only because we found that the heightened standard for mental-mental claims adopted in that case furthered the statute's goal of providing relief for only work-related injuries. 165 Vt. at 169-70, 678 A.2d at 894. The rationale underlying the unusual-stress standard is that requiring employees to show that their mental-mental injuries resulted from pressures of a significantly greater dimension than those generally encountered in the workplace will help to assure that workers' compensation benefits are limited to legitimate work-related claims. See *Sch. Dist. # 1, Vill. of Brown Deer v. Dep't of Indus., Labor & Human Relations*, 215 N.W.2d 373, 377-78 (Wis. 1974).

¶ 36. The same cannot be said, however, of the standard adopted by the majority today. I fail to see how requiring employees to demonstrate that the pressures they experienced exceeded the level typically encountered by other similarly situated employees helps to assure that *work-related*

injuries, and only work-related injuries, are compensated. In my view, such a standard is both overinclusive — in that it tends to allow more claims involving mental-mental injuries of questionable origin in low-stress occupations — and underinclusive — in that it tends to exclude legitimate claims of work-related mental-mental injuries in high-stress jobs. See *Bedini*, 165 Vt. at 173, 678 A.2d at 896 (Johnson, J., dissenting) (applying standard that compares similarly situated employees would be unfair because workers in low-stress jobs could meet standard easily, while persons in particularly stressful occupations would rarely be able to show unusual stress).

¶ 37. The instant case underscores that the control group adopted by the majority is underinclusive. The City does not challenge the sufficiency of the evidence supporting the jury's conclusions that plaintiff suffered a psychological injury, that the injury was caused by work-related stress, and that the stress causing the injury greatly exceeded that typically encountered by the general population of workers. Hence, it is difficult to see why claimant's injury should not be compensable under § 618(a)(1), which "guarantees workers a remedy for a work place injury." *Gerrish v. Savard*, 169 Vt. 468, 470, 739 A.2d 1195, 1197 (1999). A standard that would award compensation to a clerical worker who suffered a nervous breakdown after escaping from a burning building, but would deny benefits to a firefighter who suffered a nervous breakdown from fighting the very same fire — simply because firefighters typically experience such stressful stimuli, while clerks do not — violates the underlying purpose of our workers' compensation law to provide relief to all employees who have suffered work-related accidental injuries.

¶ 38. Examining cases in other jurisdictions that have adopted the "similarly situated employees" control group vividly demonstrates how difficult it can be for workers in high-stress jobs to obtain workers' compensation benefits for mental-mental claims, even when those claims are plainly based on work-related injuries. For example, in *City of Philadelphia v. Workers' Compensation Appeal Board*, 728 A.2d 938, 940 (Pa. 1999), a divided Pennsylvania Supreme Court applied such a control group in upholding a determination that a police officer who was indicted on manslaughter charges and subjected to intense media publicity before eventually being acquitted of shooting and killing an unarmed individual had not experienced abnormal working conditions so as to entitle him to workers' compensation benefits for his psychological injury. In Vermont, what level of tragedy will have to occur before firefighters or other emergency personnel will be able to obtain compensation for disabling workplace stress?

¶ 39. Undoubtedly, workers in high-stress occupations are going to suffer more work-related psychological injuries than workers in low-stress occupations, just as workers in certain types of jobs will be more likely to suffer back injuries than workers in other jobs. But there is no indication that the Legislature intended to preclude compensation for mental-stress injuries suffered by firefighters, police officers, and other workers in high-stress occupations because of greater expectations as to their ability to withstand stress. The principle of assumption of risk has no place in our no-fault workers' compensation law. See *Gerrish*, 169 Vt. at 470, 739 A.2d at 1197 (Vermont's workers' compensation law represents public policy compromise in which employee gives up right to sue employer in tort, and employer assumes strict liability for work-related injuries). The fact that emergency personnel are carefully screened before being hired and are trained to deal with the heightened daily stress they encounter on the job does not preclude them from receiving workers' compensation benefits when they suffer a mental injury notwithstanding the screening and training. Undoubtedly firefighters are trained in many areas, including how to avoid being burned. Yet, when they are burned on the job despite the training, they receive compensation. The same should be true when the injuries are psychological rather than physical.

¶ 40. The City expresses concerns that allowing mental-mental claims without requiring workers in stressful occupations to show that they experienced pressures beyond that normally encountered by other similarly situated workers has the potential to create an early pension system for such workers, at the expense of the workers' compensation system. But those are the types of complex policy considerations that the Legislature is better suited to consider. See *Hillerby v. Town of Colchester*, 167 Vt. 270, 276, 706 A.2d 446, 449 (1997). As it stands now, the unusual-stress standard is being applied administratively in Vermont in a manner that thwarts the stated policy of our workers' compensation law to compensate workers for work-related injuries, irrespective of whether those injuries have a physical or psychological origin. Absent a statutory amendment, the Commissioner may not implement the workers' compensation statute by limiting mental-mental claims in an effort to reduce the cost of insurance, rather than to ensure that benefits are being conferred for only work-related claims.

¶ 41. Some jurisdictions with statutes similar to ours do not require any additional showing of causation for workers claiming mental-mental injuries. See 2 A. Larson, Larson's Workers' Compensation Law § 44.05[4][d][iii], at 56-57 (2000). Other jurisdictions have imposed the

unusual-stress standard using an "all employees" control group, notwithstanding the potential difficulty in determining whether the claimed injury was caused by unusual pressures when compared with those experienced by all employees. See, e.g., Me. Rev. Stat. Ann. tit. 39-A, § 201(3)(A) (work-related mental injury is not compensable unless it is shown by clear and convincing evidence that stress was "extraordinary and unusual in comparison to pressures and tensions experienced by the average employee"). In *Bedini*, we deferred to the Commissioner's decision to adopt the latter approach despite the absence of explicit statutory authority, but I would decline to allow further administratively imposed restrictions that are inconsistent with the fundamental underlying purpose of our statute to compensate workers for work-related injuries. See *St. Paul Fire & Marine Ins. Co. v. Surdam*, 156 Vt. 585, 590, 595 A.2d 264, 266 (1991) ("[O]ur workers' compensation statute is remedial and must be liberally construed to provide injured employees with benefits unless the law is clear to the contrary.").

¶ 42. Ultimately, our Legislature may choose to enact a detailed workers' compensation law that imposes explicit and detailed limitations pertaining to mental-mental claims, as some other jurisdictions have done. Until then, I would hold the line at *Bedini* and allow the Legislature to weigh the complex policy considerations involved in determining whether, and if so how, to limit mental-mental workers' compensation claims.